| | |
|---|---|
| 1 | **Ian L. Barlow**, D.C. Bar No. 998500 |
| 2 | ibarlow@ftc.gov |
| | (202) 326-3120 |
| 3 | **James E. Evans**, Va. Bar No. 83866 |
| 4 | james.evans@ftc.gov |
| | (202) 326-2026 |
| 5 | **Federal Trade Commission** |
| 6 | 600 Pennsylvania Ave. NW, CC-8528 |
| | Washington, DC 20580 |
| 7 | (202) 326-3395 (fax) |
| 8 | |
| | **Faye Chen Barnouw**, Cal. Bar No. 168631 |
| 9 | fbarnouw@ftc.gov |
| 10 | (310) 824-4300 |
| | Local Counsel |
| 11 | **Federal Trade Commission** |
| 12 | 10990 Wilshire Blvd., Suite 400 |
| | Los Angeles, CA 90024 |
| 13 | (310) 824-4380 (fax) |
| 14 | |
| | **Attorneys for Plaintiff** |
| 15 | **Federal Trade Commission** |
| 16 | |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| 19 | **Federal Trade Commission**, | No. SA CV 18-0936 |
| 20 | Plaintiff, | |
| 21 | | **Complaint for Civil Penalties,** |
| 22 | vs. | **Permanent Injunction and** |
| | | **Other Relief** |
| 23 | **James Christiano**, also known as Jamie | |
| 24 | Christiano, individually and as an | |
| | owner, officer, or manager of | |
| 25 | NetDotSolutions, Inc. and TeraMESH | |
| 26 | Networks, Inc.; | |
| 27 | **NetDotSolutions, Inc.**, a California | |
| 28 | corporation; | |

1

1   **TeraMESH Networks, Inc.**, a
2   California corporation;

3   **Andrew Salisbury**, also known as
4   Andy Salisbury, individually and as
    an owner, officer, manager, or *de facto*
5   owner, officer, or manager of
    World Connection USA, LLC,
6   World Connection, LLC, and
7   World Connection, S.A.;

8   **World Connection USA, LLC**, a
9   California limited liability company;

10  **World Connection, LLC**, an Idaho
11  limited liability company; and

12  **World Connection, S.A.**, a Guatemalan
13  business entity;

14                Defendants.
15

16

17         Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

18         1.     The FTC brings this action under Sections 5(a), 5(m)(1)(A), 13(b),

19  and 16(a) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a), and

20  Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the

21  "Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties,

22  permanent injunctive relief, and other relief for Defendants' acts or practices in

23  violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's

24  Telemarketing Sales Rule ("TSR"), as amended, 16 C.F.R. Part 310.

25                          **INTRODUCTION**

26         2.     This case involves billions of robocalls dialed using software and

27  servers provided by Defendant James "Jamie" Christiano and his companies:

28  Defendants NetDotSolutions, Inc. and TeraMESH Networks, Inc. At least one

1   billon of those robocalls were programmed to transfer to a call center run by the

2   other set of defendants in this case, Defendant Andrew "Andy" Salisbury and his

3   call center businesses all named World Connection.

4         3.     In 2001, a company owned by Salisbury, his business partner Aaron

5   Michael "Mike" Jones, and two others, paid Christiano to write software that

6   would autodial telephone calls, including calls delivering prerecorded messages

7   (robocalls). In the years that followed, Christiano's software and the other dialing

8   services that he and his companies offered became widely used in the illegal

9   telemarketing industry, where the bundle of services was known as "TelWeb." In

10   addition to autodialing software, Christiano's TelWeb provided voice over internet

11   protocol phone service, servers to host the autodialing software, and space to house

12   the servers. Thus TelWeb was a one-stop-shop for illegal telemarketers.

13         4.     For many years after Salisbury and Jones paid Christiano to write the

14   autodialing software that ran TelWeb, Salisbury and Jones jointly owned and

15   controlled business enterprises that resold access to TelWeb and also dialed

16   through TelWeb. Later, Salisbury exited Jones' TelWeb resale business, but

17   Salisbury continued owning and controlling companies that dialed through TelWeb

18   and continued providing material support to Jones's TelWeb resale business.

19         5.     TelWeb, which Christiano operated through his companies, including

20   Defendants NetDotSolutions, Inc. and TeraMESH Networks, Inc., became so

21   prevalent in the world of unlawful telemarketing that it was used to dial illegal

22   calls at issue in at least eight other FTC lawsuits. *See* Appendix.

23         6.     In the most recent of these cases, *FTC v. Aaron Michael Jones, et al.*,

24   No. 8:17-cv-00058-DOC-JCG (C.D. Cal. filed Jan. 11, 2017), all of the *billions* of

25   illegal calls at issue were dialed by telemarketers through TelWeb's primary

26   reseller to commercial clients: Mike Jones, who conducted this business through an

27   enterprise of shell companies. Jones' enterprise accessed and resold access to

28

1    TelWeb under contracts with one of Jones' companies, Dial Soft Technologies, Inc.

2    ("Dial Soft"). Dial Soft was a defendant in *FTC v. Jones*.

3        7.    Salisbury spearheaded the formation of Dial Soft and also negotiated

4    Dial Soft's contracts with TelWeb. He did so after Christiano, Salisbury, and Jones

5    discussed forming a new company to act as an additional "buffer" between TelWeb

6    and the companies that dialed through TelWeb. Dial Soft was formed to serve as

7    that buffer, and Salisbury asked a friend of his to serve as Dial Soft's purported

8    owner in exchange for $1,000 per month. Salisbury then negotiated contracts

9    between Dial Soft and Christiano's companies that operated TelWeb, listing

10   himself as the "billing contact" for Dial Soft on the contracts.

11       8.    From the time Salisbury sent the contracts between Christiano's

12   companies and Dial Soft to Christiano on or about June 24, 2013, and continuing

13   through at least May 2016, Jones's enterprise resold access to TelWeb under those

14   contracts to other telemarketers, including lead generators and call centers, at a

15   mark-up. The telemarketers used TelWeb to blast out billions of robocalls to

16   American consumers. Many of these calls were also made to consumers whose

17   phone numbers were on the National Do Not Call ("DNC") Registry. And many of

18   these calls were made with inaccurate ("spoofed") caller ID numbers. For example,

19   between January 2016 and May 2016, 64 million of these robocalls used spoofed

20   caller IDs. All of these calls violate the FTC's Telemarketing Sales Rule ("TSR"),

21   16 C.F.R. Part 310.

22       9.    At the same time, Salisbury was the President and part owner of one

23   of the telemarketers that dialed through TelWeb, a Guatemalan call center called

24   World Connection.

25       10.   World Connection paid Jones's enterprise to use TelWeb to blast out

26   robocalls pitching auto warranties and home security systems. The World

27   Connection call center's robocalls about home security systems were placed to

28   generate sales for Alliance Security, Inc., a company that has been sued twice by

1    the federal government for violating the TSR, as well as by numerous private

2    plaintiffs for making unlawful sales calls.

3        11.    Since at least 2006, Christiano has known or consciously avoided

4    knowing that many of the calls dialed by Salisbury, Jones, and their businesses and

5    customers were unlawful. Salisbury and Jones are both recidivists who have been

6    sued and investigated by government agencies for unlawful telemarketing calls.

7    Many of Salisbury's and Jones's companies were also sued in private lawsuits

8    challenging unlawful telemarketing calls. Christiano's companies received

9    subpoenas for records in relation to many of the lawsuits and investigations. The

10   Federal Communications Commission ("FCC") even served a Notice of Violation

11   on Christiano that Christiano emailed to Jones and Salisbury, together with an

12   attached letter addressed to Jones stating that "[NetDotSolutions] has determined

13   that your company is responsible for the calls in question." That particular FCC

14   Notice of Violation concerned illegal calls that tied up a sheriff's 911 line.

15   Nevertheless, Christiano continued providing Salisbury and Jones the tools they

16   needed to blast unlawful robocalls for years.

17       12.    Salisbury also knew or consciously avoided knowing that the

18   robocalls calls dialed through TelWeb were unlawful. Nevertheless, he continued

19   to help Jones's enterprise that resold access to TelWeb to telemarketers, call

20   centers, and lead generators. And Salisbury's own call center, World Connection,

21   continued using TelWeb as well.

22       13.    Christiano (and his companies) and Salisbury assisted and facilitated

23   billions of illegal and abusive calls, in violation of the TSR. In addition, Salisbury's

24   call center is directly liable for millions of illegal and abusive calls that violate the

25   TSR.

26

27

28

**JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(a) and (m)(1)(A), 53(b), and 56(a).

15.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), (c)(3) and (d), and 1395(a), and 15 U.S.C. § 53(b).

**PLAINTIFF**

16.    The FTC is an independent agency of the United States government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

17.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b). The FTC is also authorized to obtain civil penalties for violations of the TSR. 15 U.S.C. § 45(m)(1)(A).

**DEFENDANTS**

***The TelWeb Defendants***

18.    Defendant **NetDotSolutions, Inc.** ("NetDotSolutions") is a California corporation with its principal place of business in Orange County, California. NetDotSolutions transacts or has transacted business in this district and throughout the United States. At one time, NetDotSolutions was registered with the FCC as a telecommunications carrier. However, on or before June 1, 2014, NetDotSolutions informed the FCC that "this company still exists, however it is no longer

performing telecommunications services." To the extent NetDotSolutions ever performed telecommunications services, it offered those services almost exclusively to entities controlled by Defendant Salisbury and Aaron Michael "Mike" Jones. NetDotSolutions was never a *common* carrier that offered communications services to the general public.

19.    Defendant **TeraMESH Networks, Inc.** ("TeraMESH") is a California corporation with its principal place of business in Orange County, California. TeraMESH transacts or has transacted business in this district and throughout the United States.

20.    Defendant **James Christiano** ("Christiano"), also known as Jamie Christiano, is an owner, officer, or manager of NetDotSolutions and TeraMESH (collectively, the "**TelWeb Enterprise**"). At all times material to this Complaint, acting alone or in concert with others, Christiano has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of the TelWeb Enterprise, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the TelWeb Enterprise, including the acts and practices set forth in this Complaint. Christiano resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

21.    NetDotSolutions, TeraMESH, and Christiano are, collectively, the "**TelWeb Defendants**."

### *The WConnection Defendants*

22.    Defendant **World Connection USA, LLC** is a California limited liability company with its principal place of business in Orange County, California. World Connection USA, LLC transacts business in this district and throughout the United States.

23.    Defendant **World Connection, LLC** is an Idaho limited liability company with its principal place of business in Orange County, California. World

1   Connection, LLC transacts business in this district and throughout the United
2   States.

3       24.    Defendant **World Connection, S.A.** is a Guatemalan business entity
4   with a principal place of business in Guatemala. World Connection, S.A. transacts
5   business in this district and throughout the United States.

6       25.    Defendant **Andrew Salisbury** ("Salisbury"), also known as Andy
7   Salisbury, is an owner, officer, manager, or *de facto* officer or manager of World
8   Connection USA, LLC, World Connection, LLC, and World Connection, S.A.
9   (collectively, the "**WConnection Enterprise**"). At all times material to this
10  Complaint, acting alone or in concert with others, Salisbury had the authority and
11  responsibility to prevent or correct the unlawful telemarketing practices of the
12  WConnection Enterprise, and has formulated, directed, controlled, had the
13  authority to control, or participated in the acts and practices of the WConnection
14  Enterprise, including the acts and practices set forth in this Complaint. Salisbury
15  resides in this district and, in connection with the matters alleged herein, transacts
16  or has transacted business in this district and throughout the United States.

17      26.    World Connection USA, LLC, World Connection, LLC, World
18  Connection, S.A., and Salisbury are, collectively, the "**WConnection**
19  **Defendants**."

20                         **COMMON ENTERPRISE**

21      27.    Corporate Defendants NetDotSolutions and TeraMESH (the "**TelWeb**
22  **Enterprise**") have operated as a common enterprise while engaging in the
23  unlawful acts and practices alleged below. The TelWeb Defendants have conducted
24  the business practices described below through the TelWeb Enterprise, an
25  interrelated network of companies that have common beneficial ownership,
26  officers and managers, business functions, employees, and office locations, and
27  that commingled funds. Because the TelWeb Enterprise operated as a common
28  enterprise, each of the entities that comprise it is jointly and severally liable for the

1  acts and practices of the TelWeb Enterprise. Defendant Christiano has formulated,
2  directed, controlled, had the authority to control, or participated in the acts and
3  practices of the TelWeb Enterprise.

4       28.    Corporate Defendants World Connection USA, LLC, World
5  Connection, LLC, and World Connection, S.A. (the "**WConnection Enterprise**")
6  have operated as a common enterprise while engaging in the unlawful acts and
7  practices alleged below. The WConnection Defendants have conducted the
8  business practices described below through the WConnection Enterprise, an
9  interrelated network of companies that have common beneficial ownership,
10 officers and managers, business functions, employees, office locations, telephone
11 numbers, and a shared, common website. Because the WConnection Enterprise
12 operated as a common enterprise, each of the entities that comprise it is jointly and
13 severally liable for the acts and practices of the WConnection Enterprise.
14 Defendant Salisbury has formulated, directed, controlled, had the authority to
15 control, or participated in the acts and practices of the WConnection Enterprise.

16                     **COMMERCE**

17      29.    At all times material to this Complaint, all Defendants have
18 maintained a substantial course of trade in or affecting commerce, as "commerce"
19 is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

20              **THE TELEMARKETING SALES RULE**
21       **AND THE NATIONAL DO NOT CALL REGISTRY**

22      30.    Congress directed the FTC to prescribe rules prohibiting abusive and
23 deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15
24 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively
25 amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

26      31.    Among other things, the 2003 amendments to the TSR established a
27 do-not-call registry, maintained by the FTC (the "National DNC Registry" or
28 "Registry"), of consumers who do not wish to receive certain types of

telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or online at donotcall.gov.

32.    Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or online at donotcall.gov, or by otherwise contacting law enforcement authorities.

33.    Under the TSR, a "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. *Id.* § 301.2(dd).

34.    The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry online at telemarketing.donotcall.gov, to pay any required fee(s), and to download the numbers not to call.

35.    Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

36.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).

37.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to any consumer when that consumer previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered. 16 C.F.R. § 310.4(b)(1)(iii)(A).

38.     The TSR prohibits sellers and telemarketers from abandoning any outbound telephone call. A telephone call is considered "abandoned" if a person answers it and the person who initiated the call does not connect the call to a sales representative within two seconds of the person's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv).

39.     The TSR requires that sellers and telemarketers transmit or cause to be transmitted the telephone number of the telemarketer and, when made available by the telemarketer's carrier, the name of the telemarketer ("caller ID information"), to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's carrier, the name of the seller. 16 C.F.R. § 310.4(a)(8). Transmitting inaccurate caller ID information, or causing inaccurate caller ID information to be transmitted, is commonly called "spoofing."

40.     As amended, effective September 1, 2009, the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service. 16 C.F.R. § 310.4(b)(1)(v). Calls delivering prerecorded messages are commonly called "robocalls."

41.     It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

42.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DEFENDANTS' BUSINESS ACTIVITIES

### *Christiano's TelWeb Automated Dialing Platform*

43.    "TelWeb" is a computer-based telephone dialing platform through which users can blast out a large volume of telephone calls, including robocalls, in a short time. TelWeb was created by and is owned by the TelWeb Defendants and affiliated companies. TelWeb operates using automated dialing software. Christiano first developed automated dialing software in or about 2001, when he wrote such software for Salisbury's company Sound Media Group, Inc. ("Sound Media").

44.    In or around 2005, Christiano and Aaron Michael "Mike" Jones formed an agreement that most, if not all telemarketing calls through TelWeb would flow through Jones and his business partners at that time—including Salisbury—as a reseller. TelWeb would contract directly only with non-commercial clients, such as schools and political campaigns seeking to make informational or political calls (which do not fall under the TSR). If a commercial telemarketer approached Christiano and wanted to use the dialing platform, Christiano would refer that commercial telemarketer to Jones or Salisbury.

45.    From June 2013 until at least May 2016, Christiano sold TelWeb access to Jones's enterprise through three companies: Defendants NetDotSolutions and TeraMESH, and a non-party voice over internet protocol ("VoIP") provider also owned and run by Christiano. Each company provided a separate service necessary to Jones's robocall enterprise:

   a.   NetDotSolutions entered into a contract with Jones's enterprise to license software that permits users to place autodialed calls that deliver prerecorded messages.

   b.   TeraMESH sold computer servers to Jones's enterprise to host the NetDotSolutions software. TeraMESH also entered into a contract with Jones's enterprise under which it provided software

maintenance patches and updates, as well as physical space in a co-location facility, electricity, and internet connectivity for the servers.

c. Christiano's non-party VoIP provider entered into a contract with Jones's robocall enterprise under which it sold VoIP phone services on a per-minute basis.

46.     Users who logged into the server hosted or maintained by TeraMESH used the NetDotSolutions software to conduct automated dialing campaigns. The server hosted or maintained by TeraMESH that ran the NetDotSolutions software then connected the outbound telephone calls using VoIP telephone lines owned by the non-party VoIP provider.

47.     During this time period, NetDotSolutions had almost no other customers or source of revenue. Christiano testified in an FTC investigational hearing that NetDotSolutions only licensed its telephony software to one customer: Dial Soft Technologies, Jones's shell company that contracted with Christiano's companies for TelWeb access and resold it to telemarketers from June 2013 to May 2016. Christiano further testified that while NetDotSolutions had a few other customers that licensed different software, ninety percent of NetDotSolutions' revenue in 2014 came from Dial Soft Technologies.

48.     Users of TelWeb can choose the caller ID that accompanies their calls—that is, they can upload lists of caller ID numbers that they want displayed with their outbound calls. TelWeb does not do any due diligence to ensure that the users actually own or license the numbers they display as caller ID numbers or that the numbers are able to receive return calls. Thus users of TelWeb can "spoof" caller IDs—that is, they can transmit inaccurate caller ID numbers with their outbound calls. In addition, TelWeb permits users to upload lists with unlimited numbers of caller ID numbers, so that a telemarketer could program a robocall campaign to transmit a different caller ID with each outbound telephone call.

49.     TelWeb also provided technology through which users were able to place outbound calls in "answering machine only" telemarketing campaigns that automatically hung up or abandoned the call when a live person answered, but left prerecorded messages when an answering machine answered the call.

50.     TelWeb also assists and facilitates robocall messages by providing telephone numbers that telemarketers may call to record a message they want to play as part of their outbound robocall campaigns.

### Salisbury and Jones's Auto Warranty
### Telemarketing Operation Dialed through TelWeb

51.     From late 2006 through early 2008, Salisbury and Jones's associates incorporated a number of now-defunct companies that functioned together as an enterprise principally engaged in lead generation, through robocalls and other telemarketing, for sellers of extended auto warranties (the "Auto Warranty Enterprise"). Salisbury was an officer or owner of several of these companies, which conducted business out of offices at 15991 Red Hill Avenue, in Tustin (Orange County), California.

52.     In 2009 the Auto Warranty Enterprise became embroiled in litigation over its telemarketing practices. Verizon Wireless sued several of Salisbury and Jones's then-clients, alleging that they made robocalls and other illegal calls. The State of Texas then sued two of the Auto Warranty Enterprise companies in federal court in Texas alleging telemarketing law violations. Salisbury and Jones were both named as individual defendants. Finally, AT&T named two of the Auto Warranty Enterprise companies as defendants in yet another robocall lawsuit. NetDotSolutions was aware of at least the first two of these cases, as the company responded to discovery requests from Verizon and the State of Texas. Illegal calls at issue in those cases were dialed via TelWeb.

### The Red Hill Robocall Enterprise Dialed through
### TelWeb with Assistance from Salisbury

53.     As the Auto Warranty Enterprise came under scrutiny from government and private plaintiffs, Salisbury, Jones, and their associates shifted their focus from auto warranty telemarketing and moved on to a new venture: the Red Hill Robocall Enterprise (as the FTC labeled it in *FTC v. Jones*). Salisbury, Jones, and their associates operated the Red Hill Robocall Enterprise from at least March 2009 to July 2015. By 2013, however, Salisbury had ceased to be a legal owner or employee of the companies comprising Jones's robocall enterprise. Nevertheless, he continued providing Jones's robocall enterprise with assistance and support.

54.     Many of the individuals and companies that operated the Red Hill Robocall Enterprise were defendants in *Jones*. Several individuals and one company settled with the FTC, while Jones and nine companies defaulted. As a result of that litigation, all of the defendants were banned from placing robocalls or calls to numbers listed on the Registry. In addition, the Court banned Jones from all telemarketing. *See FTC v. Jones et al.,* No. 8:17-cv-00058-DOC-JCG (C.D. Cal. filed Jan. 11, 2017).

55.     The Red Hill Robocall Enterprise operated from the same office space and location as the Auto Warranty Enterprise: 15991 Red Hill Avenue. This enterprise had two primary functions. First, it resold and supported TelWeb access to clients who used it to make robocalls and other telemarketing calls to consumers. These robocalls pitched home security systems, debt relief services, search engine optimization, and other goods and services. The Red Hill Robocall Enterprise's clients paid in advance for TelWeb usage in increments of minutes of calling time. Second, the Red Hill Robocall Enterprise also generated leads by placing robocalls to identify consumers interested in goods and services such as home security systems, debt relief services, and yet again, auto warranties.

56.     Salisbury collocated with the Red Hill Enterprise, and he provided the other members of the Red Hill Enterprise with advice and guidance when they received subpoenas or lawsuits.

57.     In June 2013, Dial Soft became the corporate entity that the Red Hill Robocall Enterprise used to contract with the TelWeb companies. Though he kept his name off the corporate documents filed with the Nevada Secretary of State to obfuscate his involvement, Salisbury was responsible for Dial Soft's formation and for finding its first titular owner. He was listed, however, as the "Billing Contact" on all three of Dial Soft's contracts with the TelWeb companies. Salisbury personally negotiated these contracts on behalf of Jones and Dial Soft with the TelWeb companies, including negotiating with Christiano over the rate structure for long distance minutes. On June 24, 2013, Salisbury sent the signed contracts to Christiano via email, and Salisbury even offered to hand-deliver hard copies.

58.     Salisbury also provided assistance to Jones's enterprise by providing advice on how to respond to subpoenas. Jones's former employees have testified that the enterprise received subpoenas frequently, and that they often turned to Salisbury for advice.

59.     In fact, just days after sending Christiano the Dial Soft contracts, Salisbury also corresponded with Christiano and instructed Christiano about how Christiano should respond to pending subpoenas concerning calls made through the Red Hill Robocall Enterprise's account on TelWeb, telling Christiano that "the new company name is Secure Alliance."

### Salisbury's WConnection Enterprise Dialed through TelWeb

60.     While Salisbury was providing assistance to Jones with his Red Hill Robocall Enterprise, Salisbury was also the President and a partial owner of the WConnection Enterprise. The WConnection Enterprise purchased access to TelWeb from the Red Hill Robocall Enterprise to place robocalls pitching products such as extended auto warranties and home security systems, among other goods

1   and services. For example between August 26, 2013 and March 5, 2014, the

2   WConnection Enterprise caused the initiation of millions of robocalls per day, most

3   of which used the identical voice message, which was marked in TelWeb by a "vox

4   name," or prerecorded message file name, of "347467." These robocalls were

5   initiated by employees of the WConnection enterprise, employees of the Red Hill

6   Enterprise, and/or their associate Justin Ramsey (who the FTC has also sued, see

7   *FTC v. Ramsey*, No. 9:17-cv-80032 (S.D. Fla. filed Jan. 10, 2017)).

8        61.   World Connection USA LLC operated out of 15991 Red Hill

9   Avenue—the same office space where Salisbury and Jones operated the Red Hill

10   Robocall Enterprise. Later, Salisbury formed World Connection LLC in Idaho.

11   World Connection, S.A. is a Guatemalan company.

12        62.   All three companies using the name World Connection shared a

13   website. Salisbury testified that the website represented to potential customers that

14   World Connection LLC and World Connection, S.A. were a single company.

15   Indeed, the website represents the companies as "World Connection" and lists

16   addresses and phone numbers in Idaho and Guatemala. The Website also presents

17   "Our Team" and includes officers and owners of both companies without

18   distinguishing between the two companies. The Website lists Salisbury as the

19   President of "World Connection."

20        63.   Salisbury materially participated in the telemarketing of the

21   WConnection Enterprise. For example, in June 2014, he received numerous email

22   messages providing hourly reports on the success of robocall campaigns pitching

23   extended auto warranties, and an email seeking approval of the auto warranty

24   telemarketing script. Salisbury was also involved in hiring and paying the

25   WConnection Enterprise's lead generator, Justin Ramsey, who was a long time

26   business associate of Salisbury and Jones's.

27

28

***Unlawful Calls Dialed through TelWeb***

64.     Salisbury's WConnection Enterprise and Jones's other businesses and clients are responsible for bombarding American consumers in all fifty states and the District of Columbia with billions of illegal robocalls, all dialed through Christiano's TelWeb platform.

65.     These robocalls pitched numerous different consumer goods and services, including reverse mortgages, tax debt relief, "pain cream," timeshares, vacation services, credit card debt relief, student loan debt relief, home security systems, solar energy and solar panels, extended auto warranties, medical pendants, and others.

66.     At all times from June 24, 2013 through May 2016, Salisbury, Jones, and their businesses and customers obtained access to TelWeb through Dial Soft's contracts with TelWeb, which Salisbury negotiated and delivered to TelWeb.

67.     The statistics in the following table demonstrate the magnitude of the illegal telemarketing that Salisbury, Jones, and their businesses and customers, including the WConnection Enterprise, conducted through TelWeb. The figures in this table represent only calls that were actually connected to a consumer or voicemail system; many more illegal calls were initiated through TelWeb but not connected.

| Time Period | Outbound Calls Connected (mostly unlawful robocalls) | Calls Connected to Numbers on the Nat'l DNC Registry |
|---|---|---|
| Annual averages for 2014 through May 2016 | 883 million calls per year average | 157 million calls per year average |
| January 2014 to March 2014 | More than 329 million calls | More than 32 million calls |
| January 2015 to March 2015 | More than 222 million calls | More than 40 million calls |
| June 1, 2015 to May 5, 2016 | More than 700 million calls | More than 150 million calls |

68.     On top of these violations, 64 million of the connected calls dialed through TelWeb between January 2016 and May 2016 were placed using spoofed caller ID numbers, using a specific type of spoofing called "Neighbor Spoofing."

Neighbor spoofing is when a caller spoofs the area code and exchange of a consumer's phone number so that the consumer thinks the call is coming from someone near them. For 54 million of these calls, Jones's Red Hill Robocall enterprise generated an outbound caller ID for the outbound calls by adding 128 to the number being called.

69.     These spoofed calls generated almost 8,000 consumer complaints submitted to the FTC. All of these complaints are from consumers who received calls placed through TelWeb, and all of these complaints indicate the consumer received a call with a caller ID number exactly 128 above the number of the person receiving the call. These consumer complaints describe robocalls pitching a variety of goods and services, including solar energy and solar panels, extended auto warranties, credit card debt relief, student loan debt relief, and home security systems.

70.     Many of those 64 million spoofed calls were dialed by or on behalf of the WConnection Enterprise. In addition, consumers who pressed "1" in response to many of these illegal robocalls were transferred to a telephone number licensed by the WConnection Enterprise. These spoofed calls involving the WConnection Enterprise caused many consumers to complain to the FTC.

71.     However, those were not the first consumer complaints the FTC has received about calls with spoofed caller ID numbers that were dialed through TelWeb for the WConnection Enterprise under Dial Soft's contract. For example, nearly three years earlier, on September 13, 2013, a TelWeb employee sent an email to Raymund Verallo (who signed Dial Soft's contract with TelWeb as Dial Soft's President) with the subject "spoof ANI must be removed asap" (ANI stands for automatic number identification and is another name for the caller ID number). The TelWeb employee advised: "Customer is World Connect …. [T]his is an invalid ANI …. They need to remove it and stop using it immediately." On the day of that email, September 13, 2013, twenty-three consumers complained to the FTC

about calls from the same spoofed number, many indicating they received home security robocalls. That same day, the WConnection Enterprise initiated 3,778,502 robocalls delivering a prerecorded message through TelWeb, of which 588,796 were connected. Of those 588,796 calls that were connected, only 5,019 resulted in a consumer pressing "1" for more information.

72.     Despite warning signs like this "invalid ANI," the TelWeb Defendants continued to provide all of Dial Soft's customers, including the WConnection Enterprise, the means to blast robocalls using any caller ID numbers they chose for nearly three more years.

73.     From September 14, 2013 (the day after the email from TelWeb about caller ID spoofing by WConnection, referenced above in paragraph 71) through March 4, 2014, the WConnection Enterprise—dialing through TelWeb—initiated 782,575,737 robocalls delivering prerecorded messages, of which 115,965,194 were connected. Of those 115,965,194 that were connected, only 947,617 (less than 1%) resulted in consumers pressing "1" for more information. Consumers who pressed "1" were transferred to the WConnection Enterprise's call center.

74.     Finally, Dial Soft's customers, including the WConnection Enterprise, also used TelWeb to make calls that were intentionally abandoned. This includes calls in "answering machine only" campaigns that were deliberately abandoned— TelWeb's software caused robocalls to automatically hang up on live call recipients, as the campaign was meant to only leave messages on consumers' answering machines or voicemail systems.

### The TelWeb Defendants Knew or Consciously Avoided Knowing About Unlawful Dialing by Dial Soft and its Customers

75.     The TelWeb companies continued operating under their contracts with Dial Soft even though their owner and CEO, Christiano, was aware that Dial Soft was controlled by Jones, and even though he knew or consciously avoided knowing that Dial Soft, its affiliates within Jones's enterprise, or their customers

1  (which TelWeb knew included WConnection) were using the TelWeb dialing
2  platform to make unlawful telemarketing calls. In fact, Christiano had been
3  receiving complaints about Jones from consumers, telecom providers, and the
4  FCC, since at least 2006.

5      76.    Specifically, TelWeb's owner, Christiano, knew or consciously
6  avoided knowing that Dial Soft, its affiliates within Jones's enterprise, or their
7  customers were unlawfully dialing numbers on the DNC Registry. On or about
8  December 11, 2006, Christiano emailed Salisbury and Jones and told them:

9          We are getting complaints from a batch of numbers
10         below.  We added the numbers to the DNC on 11/15, but
           they are still getting through.  It looks like Coast to
11         Coast, ABM [a company] and Mike [Jones] are dialing
12         the numbers and bypassing the DNC.  Are you running
           campaigns with NODNC? or the DNC checkbox off?
13

14     77.    A few months later, on or about April 4, 2007, NetDotSolutions
15  received a citation from the FCC for unlawful robocalls. That citation resulted
16  from a sheriff's office in Florida complaining to the FCC about home loan
17  robocalls tying up its 911 lines. Christiano then forwarded the FCC citation to
18  Salisbury and Jones, telling them they were responsible.

19     78.    From 2008 through 2011, Christiano and the TelWeb Enterprise
20  responded to several investigations by state attorneys general and subpoenas from
21  private litigants related to unlawful calls dialed or facilitated by Salisbury or Jones.

22     79.    After receiving these numerous subpoenas, on or about November 10,
23  2011, Christiano and the TelWeb Enterprise's attorney, J. Douglas Shepherd, sent
24  an email about the subpoenas to Richard Paik, who was the chief bookkeeper for
25  Jones's robocall dialing enterprises and who later paid all of the bills for Dial Soft.
26  In that email to Paik, Attorney Shepherd copied his client, Christiano, and wrote:

27         If you want to update your various company names and
           contact information with accurate business addresses and
28         responsible parties that will respond to the numerous

subpoena's [sic] that we receive for your clientele, maybe we can help out. As long as you try and avoid such matters and hide, there is not much we can do for you pal!

FYI, gave your name and cell to Indiana AG for Branding Logix [a company] yesterday. Do you want to update that information too? Is your office in that PO Box or just a mailing address?

80.    From 2012 through 2015, Christiano and the TelWeb Enterprise continued receiving subpoenas about unlawful telemarketing calls by Jones and his associates, including Dial Soft, its affiliates within Jones's enterprise, or their customers (which TelWeb knew included WConnection).

81.    In June 2015, Christiano and the TelWeb Enterprise received Civil Investigative Demands ("CIDs") from the Commission seeking information about Jones, Dial Soft, Salisbury and other companies affiliated with Jones and Salisbury.

82.    Pursuant to subsequent FTC CIDs, on September 16, 2015, Christiano appeared in Washington, DC and testified for eight hours in an investigational hearing about his relationship with Dial Soft, Salisbury, Jones, their other businesses, and the unlawful telemarketing calls that they and their clients initiated using TelWeb.

83.    Even after all of this, Christiano continued to provide Dial Soft, its affiliates within Jones's enterprise, or their customers (which TelWeb knew included WConnection) with access to TelWeb, without any meaningful change in terms.

84.    From the day after Christiano testified before the Commission through May 5, 2016, telemarketers dialing through Dial Soft's contracts with the TelWeb companies connected more than 93 million outbound calls to numbers listed on the DNC Registry and placed more than 64 million outbound calls displaying a spoofed caller ID number. Countless other illegal calls were placed through the

1  TelWeb system but not connected to a person or voice mail system that answered

2  the phone.

**VIOLATIONS OF THE TELEMARKETING SALES RULE**

**Count I—TelWeb Defendants and Salisbury**

**Assisting and Facilitating Abusive Telemarketing**

**Acts or Practices in Violation of the Telemarketing Sales Rule**

7       85.    As described in paragraphs 2–13 and 43–84, as applicable, in

8  numerous instances since June 24, 2013, the TelWeb Defendants and Salisbury

9  have provided substantial assistance or support to Dial Soft's affiliates within

10  Jones's enterprise and/or its customers, including the WConnection Enterprise,

11  who are "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing," as defined

12  by the TSR, 16 C.F.R. § 310.2.

13       86.    As detailed in *FTC v. Jones* and paragraphs 2–13 and 43–84, as

14  applicable, in numerous instances since June 24, 2013, in connection with

15  telemarketing, Dial Soft's affiliates within Jones's enterprise and/or its customers,

16  including the WConnection Enterprise:

17            a)    Initiated or caused the initiation of outbound telephone calls to

18                  telephone numbers on the National DNC Registry to induce the

19                  purchase of goods or services, in violation of 16 C.F.R.

20                  § 310.4(b)(1)(iii)(B);

21            b)    Initiated or caused the initiation of outbound telephone calls

22                  that delivered prerecorded messages to induce the sale of goods

23                  or services, in violation of 16 C.F.R. § 310.4(b)(1)(v);

24            c)    Failed to transmit or cause to be transmitted to caller

25                  identification services the telephone number and name of the

26                  telemarketer making the call, or the customer service number

27                  and name of the seller on whose behalf the telemarketer called,

28                  in violation of 16 C.F.R. § 310.4(a)(8); and

d)    Abandoned outbound telephone calls, in violation of 16 C.F.R.
§ 310.4(b)(1)(iv).

87.    The TelWeb Defendants and Salisbury knew, or consciously avoided
knowing, that Dial Soft, its affiliates within Jones's enterprise and/or its customers,
including the WConnection Enterprise, were making the calls described in
paragraph 86, which violated § 310.4 of the TSR.

88.    The TelWeb Defendants' and Salisbury's substantial assistance or
support, as alleged in Paragraphs 85-87, above, violates the TSR, 16 C.F.R.
§ 310.3(b).

### Count II—WConnection Defendants
### Unlawful Prerecorded Messages

89.    As described in paragraphs 2–13 and 60–84, as applicable, in
numerous instances, in connection with telemarketing, the WConnection
Defendants have engaged in initiating or causing the initiation of outbound
telephone calls that delivered prerecorded messages to induce the sale of goods or
services, in violation of 16 C.F.R. § 310.4(b)(1)(v).

### Count III—WConnection Defendants
### Violating the National Do Not Call Registry

90.    As described in paragraphs 2–13 and 60–84, as applicable, in
numerous instances, in connection with telemarketing, the WConnection
Defendants have engaged in initiating or causing the initiation of outbound
telephone calls to telephone numbers on the National DNC Registry to induce the
purchase of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B).

### Count IV—WConnection Defendants
### Failure to Transmit Caller ID

91.    As described in paragraphs 2–13 and 60–84, as applicable, in
numerous instances, in connection with telemarketing, the WConnection
Defendants have failed to transmit or cause to be transmitted to caller identification

services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller on whose behalf the telemarketer called, in violation of 16 C.F.R. § 310.4(a)(8).

**Count V—WConnection Defendants**

**Assisting and Facilitating Abusive Telemarketing**

**Acts or Practices in Violation of the Telemarketing Sales Rule**

92.     As described in paragraphs 2–13 and 60–84, as applicable, in numerous instances the WConnection Defendants have provided substantial assistance or support to their customers, who are "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

93.     As detailed in paragraphs 2–13 and 60–84, as applicable, in numerous instances, in connection with telemarketing, the telemarketers to whom the WConnection Defendants provided substantial assistance or support:

      a)    Initiated or caused the initiation of outbound telephone calls to telephone numbers on the National DNC Registry to induce the purchase of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B);

      b)    Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages to induce the sale of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(v); and

      c)    Failed to transmit or cause to be transmitted to caller identification services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller on whose behalf the telemarketer called, in violation of 16 C.F.R. § 310.4(a)(8).

94.     The WConnection Defendants knew, or consciously avoided knowing, that the telemarketers to whom they provided substantial assistance or support were making the calls described in paragraph 93.

95.     The WConnection Defendants' substantial assistance or support, as alleged in Paragraphs 92-94, above, violates the TSR, 16 C.F.R. § 310.3(b).

**CONSUMER INJURY**

96.     Consumers have suffered and will continue to suffer injury as a result of Defendants' violations of the TSR. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

97.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.

98.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $41,484 for each violation of the TSR. *See* 16 C.F.R. § 1.98(d) (2018). All TSR violations alleged in this Complaint, however, occurred while the civil penalty was capped at $16,000 per violation. *See* 16 C.F.R. § 1.98(d) (2016). Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

99.     This Court, in the exercise of its equitable jurisdiction, may award ancillary relief to prevent and remedy any violation of the TSR and the FTC Act.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 5(a), 5(m)(1)(A), and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), and 53(b), and the Court's own equitable powers, requests that this Court:

1    A.    Enter judgment against Defendants and in favor of Plaintiff for each

2  violation alleged in this Complaint;

3    B.    Award Plaintiff monetary civil penalties from each Defendant for

4  every violation of the TSR;

5    C.    Enter a permanent injunction to prevent future violations of the TSR

6  and the FTC Act by Defendants;

7    D.    Award Plaintiff the costs of bringing this action, as well as such other

8  and additional relief as the Court may determine to be just and proper.

9

10                                    Respectfully submitted,

11                                    **Alden F. Abbott**

12                                    General Counsel

13

14  Dated: May 31, 2018              _/s/ Faye Chen Barnouw_

15                                    **Ian L. Barlow**, D.C. Bar No. 998500

                                      **James E. Evans**, Va. Bar No. 83866

16                                    **Federal Trade Commission**

                                      600 Pennsylvania Ave. NW, CC-8528

17                                    Washington, DC 20580

                                      (202) 326-2026 / james.evans@ftc.gov

18                                    (202) 326-3120 / ibarlow@ftc.gov

19                                    (202) 326-3395 (fax)

20

21                                    **Faye Chen Barnouw**

                                      Cal. Bar No. 168631

22                                    Local Counsel

                                      **Federal Trade Commission**

23                                    10990 Wilshire Blvd., Suite 400

24                                    Los Angeles, CA 90024

                                      (310) 824-4300 / fbarnouw@ftc.gov

25                                    (310) 824-4380 (fax)

26

27                                    **Attorneys for Plaintiff**

                                      **Federal Trade Commission**

28

# APPENDIX

## FTC Litigation Involving Telemarketing Calls Dialed via TelWeb

*FTC v. Leshin*, No. 0:06-cv-61851 (S.D. Fla. filed Dec. 12, 2006)

- In May 2008, attorney Randall L. Leshin and his businesses settled claims that they used abusive telemarketing and deception to sell debt management services to consumers nationwide.
- Mike Jones and Andy Salisbury had a contract as Leshin's telemarketer / lead generator. They dialed via NetDotSolutions, a/k/a TelWeb.

*United States v. Dish Network, LLC*, No. 3:09-cv-03073 (S.D. Ill. filed Mar. 25, 2009)

- Dish Network retailers including Apex Satellite dialed robocalls via TelWeb, dialing as sub-customers under Jones's contract with NetDotSolutions.
- In June 2017, the Court enjoined Dish Network and entered a judgment of $280 million (for illegal calls dialed via TelWeb and many other dialers).

*FTC v. Transcontinental Warranty, Inc., d/b/a Voicetouch*, No. 09-cv-2927 (E.D. Ill. filed May 13, 2009)

- In March 2010, Voicetouch and its owner were permanently banned from making any prerecorded calls using deception after they had tricked consumers into buying vehicle service contracts under the guise that they were extensions of original vehicle warranties.
- Defendant Damian Kohlfeld told the Receiver 90% of calls in Complaint were dialed through NetDotSolutions, a/k/a TelWeb, by his resellers, Scott Broomfeld and Jason Birkett.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Defendants accessed TelWeb by paying C1F, owned by Mike Jones and Andy Salisbury.

*FTC v. JGRD, Inc., d/b/a Voiceblaze*, No. 2:12-cv-00945 (E.D. Pa. filed Feb. 23, 2012)

- In February 2012, Voiceblaze and its owners settled claims that they engaged in abusive telemarketing practices and assisted and facilitated the abusive telemarketing practices of others.
- Defendant Charles Garis testified that he resold access to NetDotSolutions, a/k/a TelWeb; that he paid for access by sending money to C1F; and that his contact was Mike Jones.

*United States v. Versatile Marketing Solutions*, No. 1:14-cv-10612 (D. Mass. filed Mar. 10, 2014)

- In March 2014, home security telemarketing and installation company and its owner settled charges that they called numbers on the DNC Registry.
- Justin Ramsey, Mike Jones, and their businesses generated leads for VMS via "press 1" robocalls through TelWeb.

*FTC v. Ramsey*, No. 9:17-cv-80032 (S.D. Fla. filed Jan. 10, 2017)

- In April 2017, Ramsey agreed to stipulated Order prohibiting calls to any number on DNC Registry. Ramsey used TelWeb to place unlawful calls soliciting sales for home security systems, extended auto warranties, reverse mortgages, tax debt relief, student loan debt relief, travel / vacation packages, and products.

*FTC v. Jones*, No. 8:17-cv-00058 (C.D. Cal. filed Jan. 11, 2017)

- In June 2017, the Court entered default judgment and a permanent injunction banning Jones and his companies from telemarketing, making robocalls, and calling numbers on the DNC Registry after the FTC showed that they assisted and facilitated billions of illegal calls soliciting sales for home security systems and extended auto warranties, among other products and services.
- All of the calls, including hundreds of millions to numbers on DNC Registry, were dialed via TelWeb.

*FTC v. Gotra*, No. 1:18-cv-10548 (D. Mass. filed March 22, 2018)

- Several defendants have settled, but claims remain against Alliance Security, formerly known as Versatile Marketing Solutions, and its CEO and majority owner, Jay Gotra.
- A motion for Preliminary Injunction is currently pending against the remaining defendants.
- Many of the calls by Alliance's telemarketers were dialed by or on behalf of the WConnection Enterprise using TelWeb and transferred to the WConnection Enterprise's call center.